This next case is case number 4-16-0910, In re the Marriage of Angela Joy Dunning and David Preston Dunning. Appearing for the appellant is attorney Mark Karpus and for the appellee is attorney Tyler Weaver. Good afternoon. Counsel, Justice Steigman is a member of the panel that will be deciding this case. He is unable to attend oral arguments today due to a death in the family. Oral arguments are being recorded and he will have access to the recording and will be a fully participating member of the panel in deciding this case. Mr. Karpus, are you ready to proceed? I am, Your Honor. May it please the court and counsel, It is our position that with regard to the decision that was made by Judge Everhart in Cumberland County, that when looking at the, whether it be the parenting time elements or the decision making elements, the only issue that appears to have tipped the scale in the direction of the petitioner is the fact that the petitioner received a job offer and accepted a position here in Sangamon County from Toledo in the same office apparently that she was with the Coles County Clerk. There was, as the judge pointed out there, an increase in her wages over what it is that she was making in Coles County. There does not appear to be anything else that, at least in our position, that would have warranted a removal from Coles County to where these parties were residing there to Sangamon County. This minor child has had school in Coles County. She had all of the things that are connected to the life of a minor child. All of that was in Coles County. The parties had a schedule set up basically where they had a common schedule that they would use for purposes of communicating with each other, for purposes of engaging in the activities of the minor child, for purposes of who was going to take her and when type of thing. And that schedule was not something that had been set up over the course of a short period of time, but was over the course of a period of 15 to 16 months that they had engaged in this. Neither one of these parties went to court to try to codify, for lack of a better word, that arrangement. It just worked. And both of these parties had significant involvement with regard to this child over the course of those 15 to 16 months. These parties were part of another divorce proceeding reconciled during the aftermath of the original divorce and then in the course of being married again the second time led to these proceedings, obviously. What's interesting to note is that the original judgment from Toledo would have suggested that Mom, Joy, the petitioner, had basically all the cards with regard to parenting time or custody back then. It is over the course of the aftermath of that divorce that things evolved into the schedule that we're here about or at least as far as the testimony in Toledo was concerned for 15 to 16 months. I've scoured the cases. I can't find a case that stands for the propositions that or support the facts that are in this situation where you have parties who, if it wasn't 50-50, it was pretty darn close, where you had parents who were as involved with their minor child as these were with their daughter. The daughter, I believe, was seven when she testified on camera. But there isn't anything that tipped those scales to removal other than the fact that the petitioner was taking a job, leaving Coles County, and coming here. Let me ask you a question. Yes, sir. Do you give any weight, and I think the trial judge did, do you give any weight to the fact that the mother was originally ordered custody, and you referred to it as she sort of held all the cards, but she was the responsible decision-making parent after the first divorce? I don't, Your Honor. I mean, that's accurate, but you don't think you give any weight to that? I don't, respectfully speaking. It is true that by agreement of the parties, and there was no hearing with regard to a trial such as why we're here, and Mr. Dunning did, in fact, enter into those agreements. However, those agreements basically went quickly by the wayside as they developed this 15- to 16-month period of time, not necessarily of one of them holding those cards, as I crudely stated, but that they co-parented, much as if they were married and on weird schedules, but they were able to make it work for that period of time, all in contradiction to the orders that had been entered or the agreements reached in the original D case in Cumberland County. So if there had been basically a waxing and a waning or an in and out of that arrangement, but it was always defaulting because of some conflict between the parties back to what the original judgment was judged, I would say, you know what, I probably should give some weight to that. But the fact that they came right out of the gate after that D case was resolved several years ago and went right into this shared custodial situation, the longer that we get removed from the entry of that judgment in that D case originally, the less weight that I would attach to those agreements that were reached in the original D case, if that answers your question. We get to a point, though, where what Judge Everhart did for purposes of these proceedings was basically take this child away from all of that and now with the emphasis, or at least what I thought the emphasis was, on these new parenting time and decision-making statutes that were in place was that parents were supposed to basically have as much parenting time as they possibly can. Now I understand her, the petitioner's standard of living, for lack of better words, has improved based on the fact that there have been wage increases from what she was making in polls to what she's making here in Sangamon. However, that may be in her best interest, but it doesn't necessarily equate to being in the minor child's best interest when you start looking at all of these other things that the minor child has been taken from that are collateral to these parties, and then when you get to the nuts and bolts of it, all of the things, the uprooting that's been done by the court's order allowing leave to remove and the connections that the minor child had with my client. It wasn't a matter of, hey, just can you watch her while I go to the store kind of thing, and I understand we probably wouldn't be here if that was the case, but every indication from the record in this case is that this was basically even in the aftermath of the first divorce, and while litigation was pending in this one, it was a co-parenting situation. So when you start looking at some of the older cases like Collingborn and Eckert, those are good factually as far as the law is concerned, but when you start looking at the facts of those things, you don't see cases where a party such as Mr. Dunning here had contact with, who is technically speaking, the child of a divorce where he's not the custodial parent, and that basically is how it came out from the original proceedings. She was the custodial parent and Mr. Dunning was the non. But none of the cases that I've seen, and certainly in the aftermath of the two statutes regarding parenting time and significant decision-making, the vast majority of them are Rule 23 orders anyway, but there isn't anything that strikes to how any trial court in Illinois has evaluated these elements in this environment where there is a co-parenting on such a grand scale where these parties are as cooperative as they are with each other despite the fact that they're in divorce litigation. So we believe that the mere fact and the only fact being that Ms. Dunning got new employment here in Sangamon County does not equate to a finding that should have been made that it was in her best interest to stay in Coles. Instead, I think the judge saw what was good for Ms. Dunning was good for Kaylee, the minor, and said, Okay, she can go. It's a good job. Let her take it. Now, the trial court didn't go through and for each of the best interest factors identify how it evaluated that factor. Instead, in its written judgment, the trial court indicated that it had considered the statutory best interest factors and then in that paragraph identified or elaborated on why he was allowing the request for relocation and went into discussing the mom's employment. So your argument isn't that he failed to consider other factors. It's that he placed too much weight on this one factor. Is that it? That's what it boils down to, Judge. In the court with agreement with Tyler and me, we were invited to submit written final arguments. And in our final argument, which is obviously part of the record, much like how we did in our brief, we invited Judge Everhart to do that because we did go by element by element on parenting time, element by element on the significant decision making, and cited the evidence from the record at that time that existed. And so we invited him to do that, but it was not taken upon him to do that. And it was, as you said, basically just a general conclusion was reached. But in the context of his reasoning behind what he did, and the judge spent a great deal of time with us explaining what he was doing and why, there were the two things that he cited. And I'll get to the other one here in a moment. But that of a positive nature being the fact that Ms. Dunning had received an offer for and had accepted new employment here in Sangamon. So that was it. Then you get to what I would consider to be the negative component. And the judge, Judge Everhart, did in fact reflect on certain incidents that took place at Cayley School and then also at the residence of one of the parties to stand for the proposition that there was some troubling aspect of Mr. Dunning's personality that he would need to take into account. But there was no supporting evidence with regard to those affecting, as the statute suggests, the ability of Mr. Dunning to parent, how those would somehow affect Cayley's best interest. There was no reflection by the court on that statute and how that evidence somehow fit into that statute, or it didn't. He just said, this troubles me. And those are the two things that we believe are considerations that the judge made without regard to all of the other evidence about all of the collateral things that were connecting Cayley to Coles County, including her father. I have a couple of questions. One, would the other side agree with your characterization of this as being co-parenting or so close to co-parenting that it's fair to call it that, during the time period you were talking about? It depends on where you look in the record, Judge, because there was evidence, as we have cited in the record, that would suggest from the testimony of the parties that, yes, that was in fact the case. I believe in Mr. Weaver's brief, he makes reference to the fact that there is a different portion, I believe, of the record that doesn't support that. But I think either way you look at it, however you want to characterize it, it's pretty darn close to that. My second question is, perhaps I want to make sure whether I read this correctly, did I understand that the child was affected by attendance or membership at the Cornerstone Christian Academy because of the incident with her father? It was an incident that, if I recall the record correctly, Your Honor, in a roundabout way, yes, that was. I'm not suggesting that's a primary factor here, but that would be an example of the trial court's concern for how temperament can affect the rest of the family. Well, if that's the case then, Judge, and I'm not disputing the conclusion you're reaching as far as your comment is concerned, if that is the case and you are a party to this arrangement, whether it be something that the petitioner or the respondent did, it really wouldn't matter, then this whole 15 to 16 month pattern or course of action that these parties have taken in relation to the minor child, that would cause me as a party to it, the non-offending party, bail on it. I wouldn't want to have my child exposed, let's say, to that kind of behavior. I wouldn't want to have my child be around potentially a firecracker such as that. But that's not what happened. She and he continued in this 15 to 16 month relationship with their minor child that basically was not affected by what happened at the school. So you can say that there was some impact, effect, or otherwise, but the pattern of conduct of the parties in relation to the minor child certainly would not suggest that it was a concern of either. So we believe that when you weigh all of these components, and obviously with regard to certain of the components for parenting time, they're the same as the ones for significant decision-making, that both of these parties played such an active role with regard to the parenting time that it was error for Judge Everhart to not only use such little information to base removal on, but also as far as the decision-making is concerned, to pull away from Mr. Dunning all of those things that he had done in relation to that same decision-making with regard to Kaylee as he had been doing prior to removal being allowed. And we believe that was error. We said all along, and I think we did in our final argument also, is that if Ms. Dunning wanted to leave to Sangamon County, God bless her, she could go. But there wasn't enough. There wasn't anything here that there was no family, no paramour. She hadn't established a doctor, didn't even know a teacher's name. Yet all of those things were already established in Coles County, and we believe that the trial court committed error in permitting removal and in making the decisions that he did regarding parenting time and decision-making based on really what we consider to be so little information when you start looking at all of these components that the court must consider. We believe it was error. All right. Thank you, Mr. Karpus. Thank you, Judge. Mr. Weaver?  With respect to issues of allocation of parental responsibilities for decision-making as well as an allocation as to parenting time, those are held to an abuse of discretion standard, a manifest weight of the evidence standard, and a manifest injustice standard. Let's be clear about the standard of review here as to each of the issues that we're talking about. In the brief, I had a question about your identification of the standard of review in regards to parental responsibilities, because you indicate that the review is determined by whether it is against the manifest weight of the evidence, is manifestly unjust, or is a clear abuse of discretion. Is that a quote from this Court's decision in NRA-BB? I did pull from NRA-BB, Your Honor. That's where I pulled those from, as well as Marriage of Marsh and Marriage of, I believe that would be Noki, for clarification on what those standards mean. And because of that, there is a substantial burden on the appellant to show that there was error by the trial court. And I think here that goes to a factual inquiry. There is a full record on appeal. We have well briefed these issues for the Court's consideration. And because of that, Your Honor, I was going to focus on the misconduct allegation and whether it was appropriate to make consideration of those allegations. The respondent, appellant, wants to narrowly read the Dissolution Act, where it discusses conduct not affecting the parent-child relationship. That construction, I believe, would be akin to the Petty Act case to say that this is a narrowly defined term of a social relationship between parent and child. And so if the conduct that is complained of does not occur in the presence of the child, the child is not aware of it, then that should not be something that is considered. When we're talking about statutory construction, we of course want to give consideration to what the legislature intended. And here the legislature is of course focused on the best interests of children. And if we engage in a narrow construction of that statute, it would be in conflict with our best interest factors, as certain best interest factors, particularly about whether a party is a sex offender, whether a party has engaged in domestic violence, those do not necessarily involve the child. So on one hand, to exclude misconduct that was not directed at the child, but then on another hand, reference factors that may include conduct not directed at the child, it would draw that statute into conflict. And I think here, especially in light of Section 102 of the Dissolution Statute, which says we are to liberally interpret this statute, again, focused on many ideals including the best interest of children, where we're talking about that misconduct, it's almost a principal-agent relationship. The parent is the agent for the child. The parent is tasked with making decisions for the child that will be in the child's best interest. That is, of course, what we're here for. That's what the Dissolution Act says is going to come into an issue when you have a dissolution. And so for it, there are issues that may very well affect the best interest of the child. Where we talk about the banning from Cornerstone Christian Academy and the agreement not to have contact with that staff, if those situations were to occur again in the future, Mr. Dunning would be limited in what he could do as far as seeking to the best interest of the child. He cannot even communicate with her school. And so that does come into play. It is important that the court take consideration of that. I understand that that was several years ago. And the court, Judge Everhart in this case, can make a determination as to what weight to give it. But it should be a consideration for best interest of the child. The relocation was not based solely on a better job offer. Ms. Dunning did have a limited means in the wake of this dissolution. As Judge Everhart noted, her income was going to be less than $30,000 per year. She had an opportunity to almost double that income. This is not a benefit solely to Ms. Dunning and the case law where we were formally talking about removal. And of course now we use the term relocation. But I would suggest that the relocation is a codification of the best interest standard. There is a codification of Eckert with some elaboration. I think the former case law applies. The benefit to the parent seeking that removal can flow to the child. And it's not required that we show a direct immediate benefit to the child. We can recognize that that benefit will flow through. Because of that increase in income, this child may have access, as Judge Everhart noted, to opportunities she did not have before. There were considerations made beyond simply that income though. We of course have schools to consider, a comparison. We introduced the school report cards that the Illinois State Board of Education maintains. It shows certainly that the education where the child would go, which was I believe Ball Chatham, was not of a lower standard than what she had in Charleston. It may have been better. Any relocation though necessarily does call into question what effect it would have on the parent that receives that parenting time that is not then the primary parent, in this case Mr. Dunning. And the court was concerned about what we could do to minimize the effect on him. Counsel talks about how the parties co-parented. I would disagree with that assessment. Did they have a calendar that indicated who was going to have the child when? Yes, they did. But by Mr. Dunning's own testimony in the case, he had the child under that schedule five to six days out of 14. That's not equal time. There's a clear majority time parent, and that was Ms. Dunning, under a temporary schedule, which I would point out, Ms. Dunning said she acquiesced to it because it's Dave's way or the highway, I believe is her direct quote. And so where we do have a majority time parent, I think the court gave consideration to that, but also recognized what Mr. Dunning's schedule with this child was. Judge Everhart wanted to minimize the impact on Mr. Dunning and his relationship with Kaylee and Kaylee's relationship with him. I believe under what they had under the temporary arrangement, Mr. Dunning had every other weekend. Under what we have, he still has every other weekend with the child. The court acknowledged then that he'd lost out on that time during the week. And so it may not be replaced, but we can do what we can to make up for that diminishment, and that's why the court ordered additional time in the summer. It gave him extended weekends when a holiday would fall around his weekend, so that he would then have a three-day weekend with the child instead of a two-day weekend. It should also be pointed out, and we're coming to grips with a new statute, where up until a year and a half ago, you could move anywhere in Illinois as long as you followed the order. You didn't have to ask for permission to do this. This is far different than a party seeking to move outside of the state or several states away. Ms. Dunning testified her drive between Charleston and Springfield was about an hour and a half. The parties were ultimately ordered to meet halfway. That means, yes, Mr. Dunning is going to have to drive a little less than an hour with the child at the start of his parenting time and at the end. That can still be good time, and it is a minimal burden to be placed on that parenting time, and it certainly recognizes that there is a very distinct benefit by that relocation. Sometimes I think parents get a little myopic in their focus on parenting time schedules. This is the minimum to Mr. Dunning. There's nothing that prohibits, especially where counsel is saying they have effectively co-parented and have had this great relationship. There's nothing that prohibits Mr. Dunning from asking Ms. Dunning for more time. If they really have that relationship, that's something he can do. Springfield is not so far away from Charleston that it would require great advanced planning to pop over here during the day. The testimony shows Mr. Dunning sometimes works during the day through his secondary employment, but his main employment has him working at night. These are opportunities he could have to still engage with the child as they're not that far away. He may complain of it, but I think those burdens are minimal. And the court did take it into consideration when it determined whether or not to allow the relocation. It certainly began with a recognition that Ms. Dunning had a very good faith basis for why she was asking to relocate. This was not frivolous, as in some cases that we see. Going from there, it weighed the benefit to her, the benefit to the child, against the effect it may have on Mr. Dunning and his relationship with the child. And the court came up with a schedule that it believed would be conducive to maintaining that relationship. The remaining issues, Your Honor, again, the misconduct is a portion of this analysis, both in terms of the allocation of parental responsibilities for decision-making and parenting time. But there are other issues that certainly come into play. I believe it was asked earlier whether they had a past agreement. By their first dissolution, they did. And again, they chose to reconcile. They chose to get remarried. But our best interest statute recognizes, did the parties have an agreement in the past? Yes, they did. That was an agreed-upon dissolution. They have had an agreement as far as how things would be orchestrated, both in terms of then custody as well as visitation. Ms. Dunning has also shown herself to be heavily involved in the parenting of the child. I believe she indicated in her testimony that in all of the years of this child's life, she missed one doctor's appointment. She was primarily responsible for scheduling the doctor's visits. She was always at the parent-teacher conferences. In the wake of what the record shows as an incident between the parties in September of 2015, Mr. Dunning then said, I don't want to be where Ms. Dunning is. I'm going to not go to the parent-teacher conference. His testimony says he later communicated with the teacher. He said, she's going to be there. I'm not going to be there. He then stopped taking the child to swim lessons. These behaviors, I think, go together to show a concern as to whether or not he will fulfill his best interests or the child's. Those evidence, cumulatively, the trial court heard. The trial court was certainly in a position to assess the credibility of witnesses, assess the credibility of the party, and meet with the child, not to pointedly ask her questions about what do you want, Kaylee. Do you want to move to Springfield? But to, and I think Judge Eberhardt said, kind of dance around the issues, to try to ask those open-ended questions to hear from her. One of the things that she said, I know counsel is concerned that the child had a teacher and a school and friends in Charleston. She didn't say, I don't want to go to Springfield. She said, I'm pretty good at making friends. I think she was open to these possibilities. From that in-camera interview, again, we do not have a transcript of it, but I think her testimony was positive to the judge about the relocation. Counsel makes mention of the fact there wasn't a doctor lined up over in this area, that there wasn't a teacher identified. There was a school identified. And there is certainly, again, I don't think it's that far to Charleston. There should be, I believe, evidence in the record that indicated the child had gone even to Peoria for an ophthalmologist appointment. So it doesn't necessarily require, for this close, that the child then have a new doctor lined up here. It's possible it would still be in Charleston. I don't know. But there is certainly some speculation as to what would occur. And the court in the past, I think it was Marriage of Parr, said a certain degree of speculation, that's okay. Where a parent is in good faith wanting to relocate, but is saying to the court, which is exactly what Ms. Dunning did, that I want to stay with my child. And if the court says you can have the parental responsibilities, but you can't relocate, that would be her preference to relocating without the child. Our case law indicates that a certain degree of uncertainty is okay where a parent has that perspective. And those are things that would come in time. I know, I believe it was by the closing argument, the written argument, but somewhere counsel made mention of the fact that my client did not have a lease executed. Well, there's a lot of things up in the air at that point to commit yourself to that fashion where you're awaiting a court's determination. Your Honors, I don't want to belabor the proceedings. I'm open to any additional questions that you would have. But I think the facts speak for themselves. And again, I think Judge Everhart was in the best position to assess these parties and the facts and to determine what was in the best interest of the child. I think that's exactly what he did. Thank you, Your Honors. Thank you, Mr. Weaver. Mr. Park, Mr. DePaul. Thank you, Your Honor. I would take exception to counsel's comment, respectfully so, with regard to a certain level of uncertainty being okay. As the petitioning party, they have the burden of proof. They have the burden of proof of putting to Judge Everhart evidence that basically tries to remove, I would hope, every bit of uncertainty. The child's going to go here. The child's going to be here. The child is going to do this. The child is going to have her as a teacher or him as a teacher, et cetera. And all that Judge Everhart had was uncertainty here because all that we had was a new job, and that was it. All of the testimony that counsel relies on with the issue of relocation still gets back again to the issue of a single issue, one person having a job here that is different and makes more money than the one in Coles County. That was it. There was nothing else. Mr. Weaver talked about schools. Judge Everhart considered the schools to be equal. He did not rely on that evidence as a tipper of scale in one direction or another. He weighed the Charleston schools. He weighed the schools here because I believe it was we didn't know if it was going to be Chatham. We didn't know if it was going to be Springfield proper. We didn't know at the time. But the judge did not place any specific reliance on that element in such a way or on that fact in such a way that would have certainly caused there to be some conclusion reached that he was placing reliance on that over something else. We get back to 602.7, which is a statute dealing with the conduct of a parent, and candidly there still isn't anything that I have heard with them having the burden of proof that would suggest that what it is that Mr. Dunning did that the court found to be improper went to an issue that impacted the relationship with the child given that 15 to 16 month period of time where they did what they did. The parties did. They acted in a co-parenting fashion. The record is clear on that. And if they don't go to the same parent-teacher conference, that's not grounds obviously for relocation to be the case. The five to six days that Mr. Weaver talks about does not include the fact that there were alternating weekends. Ms. Dunning had her alternating weekend. Mr. Dunning had his alternating weekend. So these periods of time that are spoken to by counsel don't address the issue of the alternating weekends. So there was additional time there within, I believe, we were looking at each party's schedule in a ten-day sense because that's how they looked at it. That's how the evidence was presented at the time of trial. Whether it's Dave's way, my client, whether it's Dave's way or the highway, would be more pressure, I would think, on Ms. Dunning to do something like go to court and secure an order. They never did. There was mediation, as is compelled now by Supreme Court rule, but there was never an order that was put in place that said this party has this parenting time, this party has this parenting time. They went along with this procedure for 15 to 16 months. So I would have to say that it, while she may say Dave's way or the highway, that certainly would seem to fly in the face of the facts that are presented. Judge Everhart did, in fact, say, I want to provide for some additional time in the summer, but that doesn't make up for lost opportunities for dinner every evening or homework to be done or contact with schools or doctors or just to see your child's face as frequently as he did. He can't do that now. And I know we're not talking about Coles County to Sangamon being from here to Honolulu, but still the fact of the matter is, when you have such a time frame that you're seeing your child on such, within a 10-day period of time, being upwards of half of that time or more than half of that time, summer visitation doesn't replace that. And that would seem, once again, to get back to the idea that we believe there was error committed. There isn't any other component other than a new job that the petitioner can rely on here to support removal. And we would ask the court to basically find that error has been committed. Thank you. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue. The court stands in recess. Thank you. We eat a lot of sausage, and it will affect his hunger. I think so. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.        Thank you. You're welcome. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you.